**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CANDICE M. TUSING,** | : | **Civil No. 3:14-CV-435** |
| **on behalf of J.K.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **CAROLYN W. COLVIN,** | : | |
| **Acting Commissioner of** | : | |
| **Social Security** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

## I.   INTRODUCTION

Plaintiff, Candice M. Tusing, appeals from an adverse decision of the Commissioner of Social Security denying her minor child, J.K.'s, application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act. The jurisdiction of this Court is invoked pursuant to 42 U.S.C. §1383(c)(3) (incorporating 42 U.S.C. §405(g) by reference). This matter has been referred to the undersigned United States Magistrate Judge on consent of the parties for resolution pursuant to the provisions of 28 U.S.C. §636(c) and Rule 73 of the Federal Rules of Civil Procedure. (Docs. 24, 25). For the reasons expressed herein, we will **AFFIRM** the decision of the Commissioner.

## II.    BACKGROUND AND PROCEDURAL HISTORY

J.K. lives with her mother (the Plaintiff) and two siblings.  he also has six half siblings who do not live with her.  Plaintiff's application for benefits reflects that her eight-year-old brother is disabled, (Tr. 111), and that he has been diagnosed with ADHD, Expressive Language Disorder and a Phonological Disorder.  Several of her half-siblings also suffer from Bipolar Disorder and ADHD.  (Tr. 453).

A routine checkup in June 2010 revealed that two-year-old J.K. was slightly anemic, her primary care provider ordered additional tests to evaluate possible lead toxicity.  (Tr. 285, 314-22, 382).  Three lead levels drawn between June 23, 2010, and July 3, 2010, confirmed that J.K. had moderately elevated lead levels, a condition that was reported to the Pennsylvania Department of Health.  Prior to being diagnosed, J.K. did not act ill, irritable or unconsolable, and did not appear to be in any pain.  (Tr. 284).  Sometime thereafter, J.K. began to exhibit disruptive behavior, which some medical professionals attributed to lead poisoning.  (Tr. 411)(reporting the diagnostic impression of Mental Disorder NOS due to lead poisoning).

Plaintiff, a single parent who works full-time while attending nursing school, testified that J.K.'s aggressive and violent behavior makes it challenging for her to find child care for her daughter.  Plaintiff stated that she feels that she is trapped at home because she cannot take J.K. anywhere.  (Tr. 33).  Plaintiff recalled one

occasion where J.K. unbuckled her own car seat and hit her brother with a tire iron that was left on the floor of the car while Plaintiff was driving.  (Tr. 33).  Plaintiff also reported that J.K. runs away from her while in public, and breaks doors, puts holes in the walls, and disables child locks when she is at home.  (Tr. 34, 38).  Plaintiff's testimony is corroborated, in large part, by the testimony of her mother (J.K.'s grandmother), who refuses to watch J.K. because of her violent behavior.

On March 21, 2011, Plaintiff protectively filed an application for SSI on behalf of her minor child J.K., alleging that J.K. became disabled on June 15, 2010, due to severe lead poisoning, severe behavioral issues, and ADHD. (Tr. 164).  This was the second application Plaintiff filed on her daughter's behalf, the first was filed when J.K. was only eight months old due to asthma.  (Tr. 45).

At the time the instant application for benefits was initiated J.K. was approaching her third birthday; J.K. was four on the date the ALJ issued his decision.  The ALJ aptly noted that J.K. was an "older infant" (ages 1 though 3) on the application date, but was a preschooler (ages 3 though 6) on the date of his decision.  See 20 C.F.R. §416.926a; (Tr. 15).

J.K.'s application for benefits was denied initially on August 29, 2011.  Thereafter, Plaintiff requested, and was granted an opportunity to appeal the Social Security Administration's initial denial during an administrative hearing.   On

3

November 1, 2012, Plaintiff, and J.K.'s grandmother, Holly Smith, appeared and testified on J.K.'s behalf during an administrative hearing before Administrative Law Judge (ALJ) Randy Riley in Harrisburg, Pennsylvania. Plaintiff was assisted by counsel throughout the proceeding. On November 29, 2012, the ALJ issued a written decision denying J.K.'s application for benefits. Plaintiff sought review of the ALJ's denial by the Appeals Council. On January 15, 2014, however, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.

On March 10, 2014, Plaintiff initiated this action by filing a Complaint in which she requests that we reverse the ALJ's denial of J.K.'s application for benefits and enter an order awarding benefits, or in the alternative, remand this case for a new administrative hearing. (Doc. 1). On May 14, 2014, the Commissioner filed an Answer in which she asserts that the ALJ's decision is supported by substantial evidence and should not be disturbed. (Doc. 8). Together with her Answer, the ALJ filed a copy of the administrative record. (Doc. 9). This matter has been fully briefed by the parties and is now ripe for decision. (Docs. 10, 11).

## III.   DISCUSSION

Plaintiff contends that the ALJ's decision denying J.K.'s application for childhood disability benefits is not supported by substantial evidence for three reasons. First, Plaintiff alleges that the ALJ failed to properly weigh the Global

4

Assessment of Functioning (GAF) scores of record.  Second, Plaintiff alleges that

J.K.'s limitations are functionally equivalent to a listing under the Social Security

Act.  Third, Plaintiff alleges that the ALJ erred when he found that Plaintiff did not

meet listing 112.08. In response, the Commissioner asserts that the ALJ properly

considered the GAF scores of record, and that ALJ's finding that J.K. did not meet

or functionally equal a listing is supported by substantial evidence.

A.     **Standards of Review–The Roles of the Administrative Law  Judge
       and This Court in Reviewing Applications for Childhood Disability
       Benefits**

Resolution  of  the  instant  social  security  appeal  involves  an  informed

consideration of the respective roles of two adjudicators–the ALJ and this Court.  At

the outset, it is the responsibility of the ALJ in the first instance to determine whether

a claimant has met the statutory prerequisites for entitlement to benefits.  A claimant

under the age of 18 ("child") shall be considered disabled for under Title XVI of the

Social Security Act if he or she "has a medically determinable physical or mental

impairment, which results in marked and severe functional limitations, and which can

be expected to result in death or which has lasted for a continuous period of not less

than  12  months."    42  U.S.C.  §  1382c(a)(3)(C)(I);  20  C.F.R.  §416.906.

Notwithstanding the above, no child who engages in substantial gainful activity, as

defined by the Social Security regulations, may be found disabled. 42 U.S.C. §

1382c(a)(3)(C)(ii); 20 C.F.R. §416.906.

### 1.     The Sequential Evaluation Process in Childhood Disability Cases

The ALJ employs a three-step evaluation process to determine whether a child is eligible for SSI payments by reason of disability.  As part of this analysis the ALJ must sequentially determine:  (1) whether the child is engaged in substantial gainful activity; (2) whether the child has a medically determinable, severe impairment; (3) whether the child's impairment or combination of impairments meets, medically equals, or functionally equals an impairment listed in part B of 20 C.F.R. Part 404, Subpart P, Appendix 1.  See 20 C.F.R. § 416.924.  If the ALJ finds that the child is not disabled at any point in the sequence, review does not proceed any further.  See 20 C.F.R. §  416.924.

### 2.     Legal Benchmarks for an ALJ's Assessment of Whether a Child's Impairment Medically Meets or Functionally Equals a Listed Impairment

At step three of the sequential evaluation process, the ALJ must determine whether a child's impairment or combination of impairments meets, is medically equivalent, or is functionally equivalent to an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  An impairment meets a listing where when it satisfies all of the criteria of that listing, including any relevant criteria in the introduction, and

meets the duration requirement. 20 C.F.R. §416.925; <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530 (1990). An impairment medically equals a listed impairment if the impairment, or combination of impairments, and its symptoms are equal in severity and duration to the criteria of any listed impairment. 20 C.F.R. § 416.926(a). If a child's impairment, or combination of impairments, does not meet or medically equal a listing, the ALJ will decide whether the impairment results in limitations that are functionally equivalent to a listed impairment.

To determine whether a child's impairment is functionally equivalent to a listed impairment, ALJ must assess the child's level of functioning in six broad areas, or domains, intended to capture all of what a child can or cannot do. 20 C.F.R. §416.926a(b)(1). These domains are: (1) acquiring and using information; (2) attending to and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and, (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(I)-(vi). In making this determination, the ALJ engages in a process commonly referred to as the "whole child approach." SSR 09-1p. The "whole child approach" requires that the ALJ assess a child's activities and evaluate how appropriately, effectively, and independently the child functions

compared to children of the same age who do not have impairments.[1] Id. In its

application, the ALJ must first identify the child's activities, limitations and

restrictions, without considering the domains of individual impairment. Id. Next, the

ALJ must assign each activity to any and all of the domains involved in performing

it. Id. Any single impairment, or combination of impairments, may result in

limitations that require evaluation in more than one domain. Id. Last, the ALJ must

assess the degree of severity of the child's limitations in each domain. Id.

In order for an impairment, or combination of impairments, to functionally

equal a listing, it must result in "marked"[2] limitations in two of the above-listed

domains *or* an "extreme"[3] limitation in one of the above-listed domains. 20 C.F.R.

---

[1]To assist adjudicators, the Social Security Administration has provided examples of typical functioning in several age categories to use as a frame of reference to determine whether a child is functioning typically for his or her age. *See* 20 C.F.R. § 416.926a. However, these examples are not all inclusive, and adjudicators are not required to develop evidence about each of them. SSR 09-3p; SSR 09-4p; SSR 09-5p.

[2] A "marked" limitation in a domain is found where impairment interferes seriously with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2). A marked limitation is more than moderate but less than extreme. Id.

[3]An "extreme" limitation in a domain is found where the impairment interferes "very seriously" with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3).

§ 416.926a(d).  In assessing whether a child has "marked" or "extreme" limitations, the ALJ must consider the resultant functional limitations of all medically determinable severe and non-severe impairments, and the interactive and cumulative effects of the child's impairments in any affected domain using the relevant factors articulated by the Social Security regulations.  Moreover, the ALJ's conclusion must be based on the consideration of all relevant evidence in the case record, including: objective medical evidence; relevant evidence from medical sources; information from other sources, such as school teachers, family members, or friends; and, the child's own statements.  20 C.F.R. § 416.924a(a).

### 3.  Other Procedural and Substantive Requisites for an ALJ Ruling–Proper Assessment of GAF Scores

A GAF score is a numerical summary of a clinician's judgment of an individual's psychological, social, and occupational functioning on a hypothetical continuum of mental health based on a scale of one hundred.  See Diagnostic and Statistical Manual of Mental Disorders, 32-34(4th ed. text rev. 2000) (hereinafter "DSM-IV-TR").  "The description of each 10-point range in the GAF scale has two components:  the first part covers symptom severity, and the second part covers functioning.  The GAF rating is within a particular decile if **either** the symptom severity **or** the level of functioning falls within the range."  Id.  A GAF score of 21-30

represents behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas. Id. at 34.  A GAF score of 31-40 represents some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood.  Id.  A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. Id.  A GAF score of 51-60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning.  Id.  A GAF score of 61-70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well with some meaningful interpersonal relationships.  Id.  A GAF score of 71-80 represents transient symptoms, if present, and expected reactions to psychosocial stressors or no more than slight impairment in social, occupational, or school functioning.  Id.

The Social Security Administration, however, has recognized that a claimant's GAF score is not considered to have a direct correlation to the severity requirements under the Social Security Act, but is medical evidence nonetheless, and must be addressed by the ALJ in making a disability determination because it is the scale used by mental health professionals to assess the current treatment needs and prognosis of their patients.  Revised Medical Criteria for Evaluating Mental Disorders and

Traumatic Brain Injury, 65 FR 50746-01, 50764-65 (Aug. 21, 2001).  Furthermore, it is well-established that "[w]here competent evidence supports a claimant's claims, the ALJ must explicitly weigh the evidence, and explain a rejection of the evidence." Schaudeck v. Comm'r of Soc. Sec.. 181 F.3d 429, 435 (3d Cir. 1999).

In applying these principles to the evaluation of GAF scores in social security cases, the district courts in the Third Circuit have held that an ALJ is obligated, not only give serious consideration to a medical source's GAF assessment, but also must specify his or her rationale for discounting a GAF score.  See e.g., Colon v. Barnhart, 424 F.Supp.2d 805, 814 (E.D.Pa. 2006)(remanding where an ALJ did not disclose his reasons for discounting several GAF scores); Span ex. rel. R.C. v. Barnhart, No. 02-CV-7399, 2004 WL 1535768, at *8(E.D.Pa. May 21, 2004)("because the ALJ failed to adequately explain how or why he discounted the significance of Carpenter's GAF scores and specifically what evidence was inconsistent with them, the Court cannot conclude that his determination ... is supported by substantial evidence.").

### B.    The ALJ's Decision

In his decision, the ALJ proceeded through each step of the three-step sequential evaluation before he arrived at the conclusion that J.K. was not disabled at any time between March 21, 2011, her protective filing date, and November 29, 2012, the date of the ALJ's decision.  At step one, the ALJ found that J.K. had not

11

engaged in substantial gainful activity during the relevant period. (Tr. 15). At step two, the ALJ found that J.K.'s alleged impairments of lead poisoning, disruptive disorder and language delay were medically determinable and severe in that they cause more than a minimal limitation in J.K.'s functioning. Id. The ALJ found that J.K.'s impairment due to asthma was non-severe. Id.

In his assessment at step three, the ALJ considered the record as a whole in order to determine whether J.K.'s impairments met a listing, or were medically or functionally equivalent to a listing. The record included testimony by J.K.'s mother and grandmother, records from J.K.'s involvement in Early Intervention Services, two competing medical reports by sources who examined J.K., an assessment endorsed by two reviewing state agency consultants, and a questionnaire completed by J.K.'s caretaker, Michele Stine.

On July 16, 2010, J.K. was referred to the local mental health and mental retardation program (MHMR) for Early Intervention Services due to her elevated lead levels, but her parents chose not to follow through. (Tr. 366). However, on March 3, 2011, J.K. was referred to MHMR a second time, and Plaintiff chose to have J.K. evaluated. (Tr. 364-75). On April 28, 2011, the result of an evaluation by MHMR revealed that J.K. had a 15% delay in cognitive development, a 12% delay in communication development, a 33% delay in social and emotional development, and

a 33% delay in adaptive development.  Id.  Because J.K. had at least a 25% delay in one or more areas of development she was deemed eligible to receive early intervention services until she aged out of the program on her third birthday.  Id.

On October 10, 2011, three months after the cessation of early intervention services, J.K. was evaluated by Dr. Krecko at Pennsylvania Comprehensive Behavioral Health Services (PCBH).  (Tr. 452-55).  Dr. Krecko diagnosed J.K. with Disruptive Behavior Disorder NOS, possible Receptive Expressive Language Disorder and Phonological Disorder, and recommended that J.K. continue to receive Intensive Mental Health Services in the form of Behavioral Health Rehabilitation Services (BHRS).  Id.  Dr. Krecko noted that J.K. had been evaluated by the Intermediate Unit and that no cognitive, speech or language delays were found, (Tr. 427), but urged Plaintiff to contact the Intermediate Unit to inquire about specialized pre-school that J.K. may be eligible for given her severe behavioral problems.  (Tr. 429).  At the administrative hearing Plaintiff testified that J.K. had an individualized education plan (IEP) at her daycare, was taught by therapeutic support staff (TSS) three hours each day and worked with a behavioral services consultant (BSC) four hours per week.  Dr. Krecko examined J.K. two more times after he completed his initial evaluation.  Following an appointment with both Plaintiff and J.K.'s BSC in

October 2012, Dr. Krecko made the decision to prescribe four-year-old J.K. medication to help with her ongoing behavioral issues. (Tr. 451).

In July 2011, J.K.'s caretaker, Michele Stine, completed a child care questionnaire in which she noted that she needed to repeat instruction several times in addition to providing J.K. with detailed explanation and visual cues each time she attempted to teach J.K. a new concept. (Tr. 401-02). Ms. Stine reported that J.K. does well with her classmates on some days, but on others she does not cooperate with the other children because she "wants her own way." Id.

On August 8, 2011, J.K. was evaluated by Dr. Christner. Dr. Christner reported that the administration of the Wechsler Preschool and Primary Scale of Intelligence, Third Edition (WPPSI-III) test revealed that J.K.'s general cognitive ability was in the upper end of the low average range, and remarked that J.K.'s abilities with regard to general knowledge, reasoning with visual information, and one-word expressive and receptive vocabulary were average for her age. (Tr. 407-11). Dr. Christner also noted that J.K. did not have the ability to engage in reciprocal conversation and that her expressive skills beyond the single word level were delayed. Id. He reported the diagnostic impression of Mental Disorder NOS due to lead poisoning and Language Delay (provisional). Id. Later the same month, two reviewing state agency psychology consultants jointly assessed J.K.'s functional equivalence under the

14

listings and concluded that she had less than marked limitations in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, caring for herself, and health and physical well-being, and no limitation in moving about and manipulating objects. (Tr. 50-51).

Based on this evidence, the ALJ found at step three that J.K. did not have an impairment, or combination of impairments, that met, medically equaled, or functionally equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. In determining whether J.K.'s impairment due to disruptive disorder met listing 112.08, the ALJ found that J.K.'s impairment did not meet the "A" or "B" criteria of the listing. (Tr. 16). In determining whether J.K.'s impairments were functionally equivalent to a listing, the ALJ found that J.K. had less than marked limitation in the areas of acquiring and using information, attending and completing tasks, interacting and relating with others, caring for herself and health and physical well-bring, and no limitation moving and manipulating objects. (Tr. 16-25).

### C.    The ALJ Properly Weighed the GAF Scores of Record

The administrative record in this case contains two competing psychological evaluations. The first report, prepared by licensed clinical psychologist Ray W. Christner, Psy.D., was commissioned by the Social Security Administration following

a one-time examination of J.K. on August 23, 2011. (Tr. 407-15). The second report, prepared by a board certified child and adolescent psychiatrist Valentins Krecko, M.D., was prepared after his first examination of J.K. on October 10, 2011. (Tr. 452-55). At the conclusion of their reports, Drs. Christner and Krecko each assessed J.K.'s GAF score. Dr. Christner assigned J.K. a GAF score of 60, which is indicative of moderate symptoms or limitations, where as Dr. Krecko assigned J.K. a GAF score of 30, which is indicative of an almost complete inability to function.

Here, the ALJ accorded little weight to the GAF score of 30 assessed by Dr. Krecko because the score was "clearly understating the claimant's abilities based on her ability to interact with her examining sources and be redirected when necessary." (Tr. 18). The ALJ also noted that "Dr. Krecko saw the claimant only twice after his initial evaluation and did not prescribe medication until October 2012, which was based solely on the mother's reports." Id. Plaintiff contends that if the ALJ had placed equal weight on these evaluations, he would likely have found that J.K. was disabled. We disagree, and find that the ALJ did not err in discounting Dr. Krecko's opinion or in according greater weight to Dr. Christner's evaluation.

With respect to his evaluation of Dr. Krecko's GAF assessment, we find that substantial evidence supports the ALJ's decision to accord it little weight because Dr. Krecko's assessment and treatment of J.K. appeared to be based on Plaintiff's

allegations rather than his own clinical observations, and it is difficult to reconcile a GAF score of 30 with the Doctor's observations that J.K. was cooperative throughout the examination.  Moreover, we find that substantial evidence supports the ALJ's decision to accord greater weight to Dr. Christner's GAF score of 60 because it was consistent with J.K.'s presentation during the evaluation, the opinion of the reviewing consultants, and the observations of Ms. Stine which indicate that J.K.'s behavioral problems at daycare are not as severe as Plaintiff alleges.  Thus, we find that the ALJ's treatment of these two competing GAF assessments is well-reasoned and well-explained, and that the ALJ's rationale in this regard is supported by substantial evidence.

**D.**     **The ALJ's Determination that J.K.'s Limitations were not Functionally Equivalent to a Listing is Supported by Substantial Evidence**

Plaintiff contends that the ALJ erred in finding that J.K.'s impairments were not functionally equivalent to a listing, and asserts that substantial evidence supports a finding that J.K. has established functional equivalence.  Specifically, Plaintiff contends that J.K.'s impairments resulted in a marked limitation in the domain of acquiring and using information, an extreme limitation in attending and completing tasks and an extreme limitation in the domain of interacting with others.  We find,

however, that substantial evidence supports the ALJ's determination that J.K. did not have two marked limitations or one extreme limitation in any functional domain.

When evaluating a child's limitations in the domain of "acquiring and using information," the ALJ considers how well a child acquires or learns information and how well a child uses that information. See 20 C.F.R. §416.926a(g); see also SSR 09-3p. The Social Security regulations also provide age group descriptors which list examples of normal functioning in this domain for older infants and toddlers (age 1 to the attainment of age 3) and preschool children (age 3 to the attainment of 6). See 20 C.F.R. §416.926a(g)(2)(ii)-(iii). Here, the ALJ found that J.K. had a less than marked limitation in this domain. (Tr. 19-20). Plaintiff contends that J.K.'s speech and articulation problems support the existence of a marked limitation in this domain. However, we find that there is substantial evidence to support the ALJ's determination. Notably, J.K. tested in the average range in the areas of general knowledge, reasoning with visual information, and one-word expressive and receptive vocabulary, and overall, J.K.'s abilities were on the high end of the low average range for her age. Furthermore, as noted by the ALJ, reports by the only two medical sources who examined J.K. noted that J.K. had only a "mild" or "mild to moderate" articulation problems. (Tr. 18).

When evaluating a child's limitations in the domain of "attending and completing tasks" the ALJ considers the child's ability to focus and maintain attention, and how well the child begins, carries through, and finishes his or her activities, including the pace at which the child performs activities and the ease with which the child changes them. See 20 C.F.R. §416.926a(h); see also SSR 09-4p. The Social Security regulations also provide age group descriptors which list examples of normal functioning in this domain for older infants and toddlers (age 1 to the attainment of age 3) and preschool children (age 3 to the attainment of 6). See 20 C.F.R. §416.926a(h)(2)(ii)-(iii). Here, the ALJ found that J.K. had less than marked limitation in this domain. (Tr. 20-21). Plaintiff contends that both Dr. Christner's and Ms. Stine's observations that J.K. demonstrated difficulty comprehending and following instructions without visual demonstration, repetition, and one-on-one coaching supports the existence of extreme limitations in this domain. However, we find that there is substantial evidence to support the ALJ's determination. Namely, despite having a short or variable attention span during Dr. Christner's examination, J.K. was cooperative, seemed to understand all directions, and although her attention quickly swayed with any downtime she could reportedly be redirected with ease.

When evaluating a child's limitations in the area of "interacting and relating with others" an ALJ considers how well the child initiates and sustains emotional

connections with others, develops and uses the language of his or her community, cooperates with others, complies with rules, responds to criticism, and respects and takes care of the possessions of others." See 20 C.F.R. §416.926a(I); see also SSR 09-5p. The Social Security regulations also provide age group descriptors which list examples of normal functioning in this domain for older infants and toddlers (age 1 to the attainment of age 3) and preschool children (age 3 to the attainment of 6). See 20 C.F.R. §416.926a(i)(2)(ii)-(iii). Here, the ALJ found that J.K. had less than marked limitation in this domain. (Tr. 21-22). Plaintiff contends that J.K.'s history of aggressive and violent behavior towards her immediate family supports the existence of extreme limitation in this domain. However, we find that there is substantial evidence to support the ALJ's determination. For example, Ms. Stine's report that J.K. only occasionally had difficulty interacting with her peers is inconsistent with Plaintiff's allegations that J.K. experienced extreme limitations in this domain. Furthermore, though Dr. Christner recognized that reports of J.K.'s aggressive behavior had been documented over the past twelve months, none of the reported behaviors were observed during his examination. (Tr. 409). Instead, Dr. Christner noted that J.K. was social, seemed to enjoy interaction, was friendly and cooperative and separated from her mother with ease. Id.

Accordingly, we find that the ALJ's determination that the combination of J.K.'s impairments were not functionally equivalent to a listing is supported by substantial evidence.

### E.   The ALJ's Determination that J.K. did not meet Listing 112.08 is Supported by Substantial Evidence

In her final argument, Plaintiff contends that the ALJ's decision that J.K.'s severe impairment due to disruptive disorder does not meet listing 112.08 is not supported by substantial evidence.  She also asserts substantial evidence supports the finding that J.K. meets listing 112.08.  For a child to meet listing 112.08, he or she must have a personality disorder "manifested by pervasive, inflexible, and maladaptive personality traits, which are typical of the child's long-term functioning and not limited to discrete episodes of illness."  20 C.F.R. Pt 404, Subpt P, Appx. 1 §112.08.  The required severity level of listing 112.08 is met when the child satisfies both the "A" and "B" criteria of this listing.  The "A" criteria of listing 112.08 require that a child demonstrate:

A.    Deeply ingrained, maladaptive patterns of behavior, associated with one of the following:
  1.    Seclusiveness or autistic thinking; or
  2.    Pathologically inappropriate suspiciousness or hostility; or
  3.    Oddities of thought, perception, speech, and behavior; or
  4.    Persistent disturbances of mood or affect; or
  5.    Pathological dependence, passivity, or aggressiveness; or

> 6.    Intense and unstable interpersonal relationships and impulsive and exploitative behavior; or
>
> 7.    Pathological perfectionism and inflexibility;

Id.

In defining the severity of functional limitation required to meet listing 112.08, the Social Security Administration has published multiple sets of "B" criteria each corresponding with separate age groupings.  To evaluate children from age 3 to the attainment of 18, like J.K., the ALJ must assess four areas:  cognitive/communicative function, social function, personal function, and deficiencies of concentration, persistence or pace.   See 20 C.F.R. Pt 404, Subpt P, Appx. 1 §112.08(B) (incorporating 20 C.F.R. Pt. 404, Subpt. P, Appx. 1 §112.02(B)(2) by reference).  A child's impairment meets the "B" criteria in this age-group when his or her impairment results in a marked limitation in two of the four areas.  Id.  The listing of impairments provides that:

> [w]here "marked" is used as a standard for measuring the degree of limitation it means more than moderate but less than extreme.  A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with the ability to function (based on age-appropriate expectations) independently, appropriately, effectively, and on a sustained basis.

20 C.F.R. Pt 404, Subpt P, Appx 1 §112.00C.

22

Plaintiff contends that the ALJ erred when he found that J.K. did not meet both the "A" and "B" criteria of listing 112.08. With respect to the ALJ's evaluation of the "B" criteria, Plaintiff asserts that the evidentiary record supports the existence of "marked" limitation in three of the four areas – cognitive/communicative function, social function, and concentration, persistence or pace. We disagree.[4] Here, the ALJ found that the record did not support a finding that J.K. had any marked limitation. Specifically, he found that J.K.'s disruptive disorder resulted in mild to moderate impairment in cognitive/communicative function, mild impairment in social functioning, mild impairment in personal functioning, and mild to moderate impairment in concentration, persistence or pace. (Tr. 16). Though the ALJ does not discuss his findings at length in that section of his decision, further support for the ALJ's findings on this issue may be drawn from the ALJ's functional equivalence assessment.

For example, the ALJ noted that both Drs. Christner and Krecko observed that J.K. presented with only "mild" or "mild to moderate" articulation problems. (Tr.

---

[4]Because a child must meet both the "A" and "B" criteria of listing 112.08 to establish the required severity level under the listing, and because we find that substantial evidence supports the ALJ's decision that J.K. did not meet the "B" criteria of listing 112.08, we need not address J.K.'s contention that she also met the "A" criteria as it would not warrant a different result in this case.

18).  Accordingly, we find that substantial evidence supports the ALJ's findings that J.K. had only "mild to moderate" impairment in the area of cognitive/communicative function, and that Plaintiff's assertion that J.K.'s delayed communication skills resulted in marked (more than moderate) limitation lacks merit.

With respect to J.K.'s limitation in the area of social functioning, we similarly find that the ALJ's determination that J.K. had only "mild" limitations is supported by substantial evidence.  In his decision, ALJ noted that despite Plaintiff's reports of hitting, biting and fighting, Drs. Christner and Krecko observed that J.K. was social and fully cooperative, and did not display any aggressive behavior.  (Tr. 18). Accordingly, we find that Plaintiff's assertion that the record supports the existence of a marked limitation in this area lacks merit.

Last, with respect to J.K.'s limitation in the area of concentration, persistence or pace, we also find that the ALJ's determination that J.K. had only "mild to moderate" limitation is supported by substantial evidence.  In his decision, the ALJ noted that on examination, Dr. Christner observed that J.K. exhibited a variable attention span while Dr. Krecko noted that J.K. demonstrated age appropriate level of attention span. (Tr. 18).  Accordingly, we find that Plaintiff's argument that J.K.'s short attention span results in a marked limitation in this area lacks merit.

While we appreciate the challenges the plaintiff faces as a single parent raising a child with some developmental challenges, our sympathy for the plaintiff's situation cannot substitute for our legal responsibilities.  In this case, that responsibility entails assessing whether the ALJ's determination that J.K. was not disabled was supported by substantial evidence that was articulated on the record of these proceedings.  Here, we find that this determination is supported by a substantial basis in fact that was fully articulated by the ALJ.  Therefore, we shall affirm the judgment of the ALJ in this matter.

## IV.     Conclusion

Accordingly, for the foregoing reasons, we will affirm the decision of the Commissioner.

An order consistent with this memorandum will be entered separately.

*S/Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

**Dated:** October 30, 2014